Argued and submitted September 14, 1983, affirmed February 22, 1984

# WHITE'S ELECTRONICS, INC.,
*Appellant,*

*v.*

# TEKNETICS, INC. et al,
*Respondents.*

## (81-0903; CA A24990)

677 P2d 68

J. Pierre Kolisch, Portland, argued the cause for appellant. With him on the briefs were Jon M. Dickinson, Francine H. Gray and Kolisch, Hartwell & Dickinson, Portland.

Edward P. Monks, Eugene, argued the cause for respondents. With him on the brief were Kenneth A. Morrow, Morrow, McCrea & Divita, Eugene, and Gary S. Kindness, Of Counsel, Seattle.

Before Gillette, Presiding Judge, and Warden and Young, Judges.

GILLETTE, P. J.

## GILLETTE, P. J.

Plaintiff White's Electronics, Inc. (White's) commenced this action seeking the imposition of a constructive trust for its benefit in all rights, patentable or otherwise relating to an invention developed by defendant George Payne. White's also sought an injunction restraining defendants from selling any product embodying such an invention and from using any trade secrets or other proprietary information belonging to plaintiff. The trial court denied White's any relief. We affirm.

White's is a manufacturer of metal detectors. In 1969, White's hired Payne, an electrical engineer, to invent new metal detector technology. In 1971, Payne signed an employment agreement with White's that stated that he would assign to White's any invention that he developed during and for six months after termination of his employment that related to White's activities or was the result of tasks assigned by it. During this period of employment, Payne assigned to White's two patents covering inventions pertaining to metal detectors. In mid-1976, he terminated his employment and went to work for Bounty Hunters, one of White's competitors. He remained there until late 1978, when he sought reemployment with White's. Because of a noncompetition agreement with Bounty Hunters, he did not become reemployed by White's until January, 1980. He did, however, work as a consultant for White's during the intervening period. When Payne was rehired, he did not sign a new employment agreement. As during his previous employment, he worked to develop innovations in the metal detector field and to solve problems related to White's product line. He assigned one patent to White's during this employment period.

The evidence concerning the events of January, 1981, is both conflicting and confusing. Payne testified that on January 9, 1981, he conceived an idea that would enable a metal detector automatically to provide the user with target identifying information, unlike any detector then on the market. He stated that he told defendant Morris, White's marketing manager, of his idea, but that he did not work any further on its development until January 15, when he

assembled a breadboard—a board containing electrical circuits—to test his idea. The breadboard failed to achieve the desired result.

On January 17, 1981, following a period of internal management disruption at White's, Payne and Morris both quit. Payne testified that, on January 19, 1981, while working to develop his idea of January 9, he "found something that is going to make this thing work, or allow me to continue development of it." He stated that, following this "breakthrough," he still had to work for many more months before his concept was perfected.

On January 28, 1981, Payne and Morris, along with defendant Smith, organized defendant Teknetics, Inc., to market metal detectors in direct competition with White's. In December, 1981, Teknetics introduced a metal detector which incorporated Payne's target-identification concept.

Plaintiff contends that Payne's "breakthrough" on January 19, actually occurred earlier while he was still employed by White's. In support of this contention, plaintiff introduced Payne's engineering notes containing circuitry designs dated January 18, 1981. Payne admitted that the date on those notes was in error and that they were probably prepared sometime before the 18th. Plaintiff's expert, an electronics engineer, testified that he or someone similarly skilled could build a target-identification circuit based on the information provided in the drawing. Payne testified to the contrary, stating that the key element to his target-identification concept did not appear in his notes until January 19, after he had left White's employ.

The trial court found that Payne conceived his target-identification concept on January 9, but that he did not exert time and effort to develop it until after January 17, the date he left White's employ. According to the court:

> "The idea achieved the status of invention sometime in March of 1981, as evidenced by the order for print out circuitry systems from another company. Prior to reaching this posture, [Payne] had to address himself to and solve problems of target identification as they related to ground rejection."

The trial court concluded from the foregoing that plaintiff was not entitled to either the assignment of the patent or the imposition of a "shop-right." This appeal followed.

■■    Absent an agreement to the contrary, an employe who is hired to invent, and who succeeds during his term of service in accomplishing that task, is bound to assign to the employer all rights in the invention. *United States v. Dubilier Corp.*, 289 US 178, 187, 53 S Ct 554, 77 L Ed 1114 (1933); *Mainland Industries v. Timberland Mach., & Eng.*, 58 Or App 585, 589, 649 P2d 613, *rev den* 213 Or 801 (1982), *cert denied* 460 US 1051, 103 S Ct 1498, 75 L Ed 2d 930 (1983). Furthermore, the practice by an employe of assigning patents to an employer constitutes persuasive evidence of a duty to assign. *Mainland Industries v. Timerland Mach. & Eng., supra,* 58 Or App at 591.

■    In this case, when Payne was rehired by White's in 1980, no new employment agreement was executed. Although Kenneth G. White, president of White's, testified that he intended to rehire Payne on the same terms as his previous employment, the issue apparently was never discussed by the parties. The evidence is insufficient to support a conclusion that the 1971 agreement was revived by Payne's reemployment. However, even without an express agreement, we find that Payne was obliged to assign to White's inventions created during his employment. Payne was hired precisely because of his exceptional inventive abilities in the metal detector field. His duties were to invent and develop improvements in White's product line. This, in conjunction with Payne's practice of assigning patents to White's, including during his last period of employment, convinces us that he had a duty to assign all inventions arising during his employment.

■    Thus, the central issue in this case is whether Payne's target-identification concept was sufficiently developed at the time he left White's employ so as to constitute an "invention" to which White's is entitled. Because White's is seeking the imposition of a constructive trust, it must prove its case by strong, clear and convincing evidence. *Pantano v. Obbiso,* 283 Or 83, 87, 580 P2d 1026 (1978).

We are unable to find any Oregon cases dealing directly with this issue. Both sides cite numerous cases from other jurisdictions in which the term "invention" has been

defined under a variety of factual circumstances. Most courts have adopted a definition which requires that an invention be something more than a thought in an inventor's mind. As stated in *National Development Co. v. Gray,* 316 Mass 240, 55 NE2d 783 (1944):

> "Of course there is a distinction between the conception of an idea and the reduction of the idea into practice. The idea is only the starting point, and it does not become an invention until it is developed and perfected and becomes embodied in some tangible form which becomes some novel and useful device or process." 316 Mass at 249.

In *National Development Co.,* on which plaintiff places great reliance, defendant Lawson, an employe of a company that manufactured shoe-heeling machinery, conceived of an idea for an improved model of that kind of machine while he was in that company's employ. Before he quit, he had reduced his idea to a drawing. The court ruled that, even though he had not yet constructed a working model of the machine,

> "* * * the idea had crystallized into such definite form by the time Lawson left the plaintiff's employment that he and those with whom he spoke concerning the new machine knew in a general way the principles governing its operation and its probable practical value. * * *

> "It is plain from the evidence * * * that the drawing was the nucleus from which the machine emerged; that whatever Lawson accomplished up to the time he quit belonged to plaintiff, * * * that the activity of Lawson in reference to the new machine constituted a breach of his contract with the plaintiff; and that the latter was entitled to the patent." 316 Mass at 250.

■ We find the *National Development Co.* analysis helpful, but we reach a different result as an evidentiary matter. In our view, the evidence in the present case is not clear and convincing that the unsuccessful breadboard Payne assembled prior to his leaving White's employ was the "nucleus" from which his target-identification concept emerged. We are not convinced that, at the time Payne left White's, his idea had "crystallized into a definite form." In fact, one of the key elements of the idea was not developed until after his resignation. When Payne left White's, he left with an idea and a goal, but not with an invention. White's,

therefore, is not entitled to a constructive trust or to assignment of the patent.

White's argues that such a holding will encourage employed inventors deliberately to refrain from putting ideas into tangible form in order to circumvent employer's rights. Our response is that employers could protect themselves by requiring inventors to enter into contracts that provide that the employer is entitled to any inventions conceived during the term of employment and during a reasonable period of time after termination. In fact, White's required Payne to sign such an agreement during his first period of employment. Its failure to obtain such an agreement the second time around is fatal to its case.

White's contends in the alternative that it is entitled to a "shop-right" in Payne's target-identification concept. A "shop-right" is a non-assignable license to a patent granted to an employer when an employe who works in a *general or non-inventive capacity* creates an invention using the employer's time and materials. *Mainland Industries v. Timberland Mach. & Eng., supra,* 58 Or App at 593. Payne, however, was hired specifically as an engineer whose duties included inventing and developing improvements in White's product line. Thus, the facts do not warrant the application of the "shop-right" doctrine.

White's final contention is that it is entitled to a permanent injunction to prevent defendants from using trade secrets, proprietary know-how or confidential information acquired from White's. Our review of the record does not reveal any evidence to support the granting of such an injunction.

Affirmed.