Lauriat, Peter M., J.
This action concerns a dispute with respect to the Massachusetts General Hospital (“MGH”) Intellectual Property Policy (the “IP Policy” or “Policy”) which determines who owns staff inventions. Plaintiffs Joseph A. Grocela, M.D. (“Dr. Grocela”) and Grindstone Medical LLC (“Grindstone”) (collectively the “plaintiffs”) assert that the IP Policy as applied is an unfair restraint on trade, and that The General Hospital Corporation and Partners Healthcare System (“Partners”) (collectively, with MGH, the “defendants”) have breached his right to privacy in violation of G.L.c. 214, §1B. The defendants have now moved to dismiss the Second Amended Complaint or, in the alternative, for summary judgment.[1] For the following reasons, the defendants’ motion is allowed.
BACKGROUND
For more than ten years, Dr. Grocela has been a senior clinical staff physician at MGH, with a surgical specialty in urology. He is also the manager of Grindstone, a limited liability company he formed in 2009 to develop and market medical devices. As a condition of his biennial application for reappointment to the staff of MGH, and in return for the privileges, benefits and opportunities afforded therefrom, Dr. Grocela, like all staff physicians, must certify that “I understand that the ownership and disposition of inventions and other intellectual property that I create during the time when I have my Professional Staff appointment shall be determined in accordance with the Intellectual Property Policy of the hospital, a copy of which is available [online].”
The IP Policy determines who owns inventions, as between MGH and its staff, and sets forth procedures by which staff physicians must disclose their inventions. Specifically, the Policy states that MGH shall own all staff inventions “that arise out of or relate to the clinical, research, educational or other activities of the Inventor at [MGH].” The grant of staff privileges is revocable and non-negotiable. Hence should Dr. Grocela refuse to agree to the IP Policy, his privileges would be revoked and he would no longer be able to practice at MGH.
The Research Ventures & Licensing Department (the “RVL Department”) administers the Policy. When it receives invention disclosures, it determines whether MGH owns the invention, pursues patents if necessary, and seeks partners to bring the invention to market.[2] The RVL Department can also decide to relinquish MGH’s rights to the invention back to the inventors on a discretionary basis. All invention disclosures as well as all records and files of the RVL Department are kept in the Department’s secure offices and are considered confidential. Access to the offices requires a securify pass and all visitors are accompanied by an RVL Department member.
Dr. Grocela has, over the years, disclosed at least nine inventions to the RVL Department. Of importance to the motion now before the court are three of those, described by the parties as the 2004, 2005 and 2008 inventions. All three arose out of or were related to Dr. Grocela’s practice in urology. The 2004 invention was influenced by Dr. Grocela’s experience as a child. As to the 2005 invention, he informed the RVL Department that it was a “novel” way to apply medical equipment used by Dr. Grocela at MGH to treat another medical condition with which he is occasionally afflicted. He disclosed to the RVL Department that he had tested the device on himself for three weeks with success. He further disclosed that condition in a September 30,2010, letter to the president of MGH, acopy of which Dr. Grocela sent to a “mutual friend.”
To attract licensing partners, the RVL Department publicized the 2005 invention, naming Dr. Grocela as the inventor, and posting a public notice that, with respect to its effectiveness, stated it was “tested on a single patient with promising results." The Department also applied for a patent. In 2009, Tracy Dodenhoff, individually and as a member of Vanguard Technologies, entered into a confidentialiiy agreement with MGH for the purpose of exploring the potential for licensing the 2005 invention. As he had previously, as part of his disclosure of the 2008 invention, Dr. Grocela referenced his own personal experience and medical history.
In August 2010, at Dr. Grocela’s request, MGH assigned to him its interests in the 2004, 2005 and 2008 inventions in exchange for a right to receive 1.5% royalty from any sales, along with a royalty-free license to MGH and its affiliates to use the inventions. The parties do not dispute that, with those conditions, Dr. Grocela now owns the rights to all three inventions. Dr. Grocela subsequently began to explore the potential for licensing the 2005 invention with Dodenhoff and another individual, Hong Xu. He asserts that in face-to-face meetings, both Dodenhoff and Hong Xu *178 said to him something to the effect that “so you are the single patient."
In 2011, Dr. Grocela and Grindstone entered into an agreement for the purpose of enabling Grindstone to raise investment capital to develop and market its patents and to develop and market any of Dr. Grocela’s future inventions not owned by MGH and created from June 1, 2011, for twenty years. On or about Januaiy 4, 2012, Dr. Grocela conceived of another invention, a device for voice training to help a musician harmonize and a singer to sing notes more precisely, and/or to improve tonal precision for tone deaf people (the “voice box invention”). Dr. Grocela also asserts that the device would enable mute patients, who had a laiyngectomy or removal of vocal cords, to phonate. While there is no dispute that Dr. Grocela conceived of the voice box invention outside the hospital, on his own time and at his own expense, he has acknowledged that this invention “utilizes or incorporates knowledge that [he] generated or acquired in the course of his clinical, research, educational, or other activities as a member of the professional staff at MGH.” SOF, ¶61.
Dr. Grocela filed this action on March 3, 2011, and filed his Second Amended Complaint on Januaiy 27, 2012. He presently advances two claims. In Count I, he seeks a declaratoiy judgment to the effect that the IP Policy, “as applied” to him, is an unenforceable restrictive business covenant that prevents him from engaging in ordinaiy competition. In Count II, Dr. Grocela claims a breach of his right to privacy under G.L.c. 214, §1B with respect to his personal health information. In Count III, Dr. Grocela seeks restitution for MGH’s retention of royally rights for the 2004,2005 and 2008 inventions.
DISCUSSION
Summaiy judgment will be granted where, viewing the evidence in the light most favorable to the non-moving party, all material facts have been established and the moving party is entitled to judgment as a matter of law. Cabot Corp. v. AVX Corp., 448 Mass. 629, 636-37 (2007); Mass.R.Civ.P. 56(c). “The moving party must establish that there are no genuine issues of material fact, and that the nonmoving party has no reasonable expectation of proving an essential element of its case.” Miller v. Mooney, 431 Mass. 57, 60 (2000). See also Pederson v. Time, Inc., 404 Mass. 14, 16-17 (1989). When, as here, the moving party does not bear the burden of proof at trial, it is entitled to summary judgment either by submitting affirmative evidence that negates an essential element of the opposing parly’s case, or by demonstrating that the opposing party has no reasonable expectation of proving an essential element of its case at trial. Kourouvacilis v. General Motors Corp., 410 Mass. 706, 716 (1991). “Conclusory statements, general denials, and factual allegations not based on personal knowledge [are] insufficient to avoid summaiy judgment.” Cullen Enters., Inc. v. Massachusetts Prop. Ins. Underwriting Ass’n, 399 Mass. 886, 890 (1987).
I. The IP Policy
The gist of Dr. Grocela’s argument is that MGH’s ownership of both medical and non-medical inventions that incorporate knowledge “generated or acquired in the course of’ his tenure at MGH, but which were created outside the hospital and on his own time, is an unreasonable, oppressive and unduly harsh restraint on trade. He first contends that MGH’s ownership is limited to inventions “that arise out of or relate to the clinical, research, educational or other activities of the Inventor at [MGH],” in his case the practice of urology. Hence any invention that does nor arise therefrom, presumably the voice box invention and any future, non-urological inventions, are not within the ambit of the Policy. In addition, Dr. Grocela claims that the IP Policy bars the plaintiffs from ordinaiy competition and thus is contraiy to public interest, which favors a person’s right to carry on his trade freely. The defendants counter that the IP Policy is valid on its face and as applied, regardless of whether Dr. Grocela’s purported and future inventions address problems outside of urology, and irrespective of where and how they were invented.
The principal guide to contract interpretation is, of course, the language of the contract itself. Interpretation of unambiguous language in a contract is a question of law for the court to decide. Edwin R. Sage Co. v. Foley, 12 Mass.App.Ct. 20, 28 (1981). “Words that are plain and free from ambiguity must be construed in their usual and ordinaiy sense.” Citation Ins. Co. v. Gomez, 426 Mass. 379, 381 (1998); Somerset Sav. Bank v. Chicago Title Ins. Co., 420 Mass. 422, 427 (1995). Here, the express language of Dr. Grocela’s application for staff privileges imported the IP Policy. See, e.g., Madonna v. Trustees of the Univ. of Massachusetts, 32 Mass.App.Ct. 693, 694 (1992). Therefore, the two must be read together. See, e.g., Chelsea Indus., Inc. v. Florence, 358 Mass. 50, 55 (1970).
Under the plain language of Dr. Grocela’s application, he agreed that the disposition of inventions and other intellectual property that he created during his appointment was to be determined by the provisions of the IP Policy. That is, while a staff physician, Dr. Grocela is required to disclose all inventions to the RVL Department and to await a determination as to whether MGH will claim ownership and under what conditions. As a matter of contract interpretation, under the IP Policy, Dr. Grocela was and is obligated to assign his rights to an invention to MGH if that invention arises out of or relates to Dr. Grocela’s clinical, research, educational or other activities at the hospital. There is no dispute that the 2004, 2005 and 2008 inventions arose out of Dr. Grocela’s practice of urology at the hospital and, in any event, MGH has relinquished ownership of those inventions to Dr. Grocela. As to the voice box invention, Dr. Grocela *179 himself does not dispute that it arose out of his activities at MGH. He signed the application and agreed to the Policy and must therefore be bound by its terms.
The question remains, therefore, whether the IP Policy is an unreasonable restriction on competition. In general, the “law looks upon an invention as the property of the one who conceived, developed and perfected it, and establishes, protects and enforces the inventor’s rights in his invention unless he has contracted away those rights.” National Dev. Co. v. Gray, 316 Mass. 240, 246 (1944). In National Dev., the court concluded that, even absent an express pre-invention contract, an employee’s invention was the property of his employer if the employer contemplates the discovery of an invention and the employee reasonably understood that inventions resulting from his employment would belong to the employer. Id. at 247.[3] Although the invention was prepared in the employee’s own home and on his own time, it nonetheless came within the scope of his employment and belonged to the employer “no less than if [it] was made at the [employer’s] shop.” Id. at 250. See also Steranko v. Inforex, Inc., 5 Mass.App.Ct. 253, 269 (1977) (“The law of this jurisdiction recognizes that even in the absence of specific contract provisions an employer may be entitled to the inventions of employees hired to direct or to engage in inventive research”); see also Thermo Electron Eng’g Corp. v. Lyczko, Essex Super. Ct. Eq. No. 15519, 159 U.S.P.Q. 303, 303-05 (Sept. 30, 1966) (employer entitled to invention that arose out of research in discipline for which inventor was hired, even if the invention was outside that field); Freedom Wireless, Inc. v. Boston Communications Grp., 220 F.Sup.2d 16, 19 (D.Mass. 2002) (public policy not violated where contract requires employees to assign inventions relating to employer’s business, since they were “within the subject matter of the employment relationship”).
Here, the agreement between Dr. Grocela and MGH specifically provides that Dr. Grocela will contribute to the research and educational objectives of his department. The IP Policy specifically states that “This Policy governs the handling of Inventions, Copyrightable Works, and other Intellectual Property and Tangible Research Property made by individuals involved in educational, research, clinical and other activities of [MGH] ...” Clearly, Dr. Grocela obtained staff privileges in return for contributing, developing and implementing research projects, including inventions, which in turn are subject to possible ownership by MGH. “It is difficult to imagine how the parties could have expressed themselves more forcefully.” US Trust v. Henley & Warren Mgmt., Inc., 40 Mass.App.Ct. 337, 341 (1996). Finally, the IP Policy does not contemplate that MGH would claim rights to an invention that had nothing to do with the staff member’s activities at MGH.
Nor does the court consider the IP Policy to be unreasonable. Nothing prohibits Dr. Grocela from practicing medicine either in Massachusetts or elsewhere. That he would lose his privileges at MGH and Partners’ affiliates should he refuse to be bound by the terms of the Policy is immaterial. As a member of the staff, he reaps the benefit of the clinical resources, office space, access to doctor-patient relationships and professional prestige available to a physician who practices at one of this country’s major teaching hospitals. In return, he has agreed to contribute to the research and educational objectives of the Urology Department. This kind of quid pro quo underlies almost every professional association. Furthermore, the defendants have a legitimate public interest in freely sharing staff inventions to further research and, in the end, benefit the population the defendants serve, that is, their patients. This outweighs any possible (and purely speculative) restraint on competition. For these reasons, the defendants’ motion for summary judgment on Count I must be allowed.
Count III fails for much the same reasons. The court has already determined that the IP Policy is valid and enforceable. Furthermore, Section 6.6(i) and (ii) specify that, should MGH decide to relinquish an invention at the inventor’s request, MGH may “retain a royalty-free non-transferable license for research, clinical and educational purposes” and may require the inventor to pay “royalties to the Institution on sales of products or services covered by the relinquished Invention.” Dr. Grocela is a sophisticated professional who has repeatedly agreed to abide by the IP Policy and who had disclosed at least nine inventions to the RVL Department. He cannot now rewrite his obligations to the hospital.
II. Invasion of Privacy
Dr. Grocela’s claim for invasion of privacy is premised on two grounds. First, he contends that MGH violated his privacy by maintaining information regarding his medical condition in its electronic and paper records. He asserts that the RVL Department should have “de-identified” him as the inventor and redacted any mention of his medical condition. Second, he contends that in its publicly available website advertisement for the 2005 invention, MGH listed him as the inventor and stated that “[t]he device has been tested on a single patient with promising results." As a result, he contends that two individuals were able to infer that he was the single patient.
As a basis for his argument, Dr. Grocela first invokes the protections of the Health Insurance Portability and Accountability Act of 1996 (“HIPAA”). His reliance on HIPAA is unavailing. Although he does not purport to sue under HIPAA,[4] he argues that HIPAA and its attendant regulations “provide contextual standards for a jury to weigh in determining whether the interference with Dr. Grocela’s privacy was ‘unreasonable, substantial or serious’ under the circum *180 stances.” As best as the court can understand, Dr. Grocela’s contention appears to be that under HIPAA, the defendants have an affirmative duty not to disclose his personal health information for any business purpose without advance notice to him. But HIPAA is designed to protect the privacy of patients that receive treatment, not that of employees where the hospital serves as an employer. Under 45 C.F.R. §106.103, protected health information is defined as individually identifiable health information. Section 106.103 specifically excludes from the definition of protected health information (“e]mployment records held by a covered entity in its role as employer.” The plaintiffs have cited no decision that stands for the proposition that HIPAA creates in the institution an affirmative duty vis-a-vis an employee acting in that capacity.
Dr. Grocela next turns to G.L.c. 214, §1B, which provides, in pertinent part, that “(a) person shall have a right against unreasonable, substantial or serious interference with his privacy.” To prevail on an invasion of privacy claim, a plaintiff must prove “not only that the defendant unreasonably, substantially and seriously interfered with his privacy by disclosing facts of highly personal or intimate nature, but also that it had no legitimate reason for doing so.” Martinez v. New England Med. Ctr. Hosps., Inc., 307 F.Sup.2d 257, 267 (D.Mass. 2004) (applying Massachusetts law and citing Schlesinger v. Merrill Lynch, Pierce, Fenner & Smith, Inc., 409 Mass. 514, 518 (1991)). For the purposes of this motion, the court will assume that the information that Dr. Grocela claims MGH disseminated was of a highly personal or intimate nature. The remaining questions are whether any interference was reasonable and substantial or serious, and whether MGH had any countervailing legitimate business interest in disclosing that information.
Although not always the case, in general “publication is an essential ingredient of the tort of invasion of privacy.” Bratt v. International Business Machines Corp., 382 Mass. 508, 518 n.14 (1984). In Bratt, the court held that intracorporate communication amounted to sufficient publication under § IB. It then concluded that “because IB proscribes only unreasonable interferences with a person’s privacy, legitimate countervailing business interests in certain situations may render the disclosure of personal information reasonable and not actionable under the statute.” Id. at 520. In making such a determination, a court “must balance the employer’s legitimate business interest in obtaining and publishing the information against the substantiality of the intrusion on the employee’s privacy resulting from the disclosure." Id. at 521. Although in general the balancing of competing interests involves a factual inquiry, where the record supports a de minimus intrusion into the employee’s privacy, that case is suitable for dismissal. See, e.g., French v. United Parcel Service, Inc., 2 F.Sup.2d 128, 131 n.2 (D.Mass. 1998) (applying Massachusetts law).
Here, Dr. Grocela himself disclosed his personal medical information in the disclosure form to the RVL Department and in a letter to the president of MGH that he copied to a mutual friend. He does not dispute that the RVL Department treats invention disclosures as confidential, that the Department can be accessed only by persons that work in the Department, and that visitors must be accompanied by an RVL Department employee. Nonetheless, he asserts that the defendants “have no record of the number of times or the number of RVL employees . . . have accessed the information in its database identifying Dr. Grocela and concerning his medical conditions.” SOF, ¶112. Based on his conversations with Dodenhoff and Hong Xu, he argues that “the summary judgment record allows an inference that the inventions business opened its files to at least two outside third parties.”
This allegation is insufficient to defeat summary judgment. As a threshold matter, Dr. Grocela chose to disclose his medical condition on the inventions disclosure forms. MGH does not require such information; it only requires full details of the invention. In addition, Dr. Grocela wrote a letter to the president of MGH, that he copied to a mutual friend, in which he disclosed that information. There is nothing in the record from which the court could conclude that the RVL Department or the defendants disseminated Dr. Grocela’s medical information to the public. That there is a brief mention of Dr. Grocela’s medical condition in RVL Department files, does not constitute a “serious” or “substantial” intrusion upon his privacy.
With respect to listing the invention on the MGH website, the listing identified Dr. Grocela only as the inventor, it did not name him as the “single patient.” Although both Dodenhoff and Hong Xu apparently guessed that Dr. Grocela had tried the invention on himself, absolutely nothing in the record indicates that MGH disclosed that information to either individual.
Finally, MGH has a legitimate and reasonable business interest in maintaining and sharing information regarding staff inventions with a limited group of personnel and lawyers, particularly in the pursuit of patents, as was the case with the 2005 invention. If an invention is successfully marketed, both MGH and the inventor share in the profits. Moreover, as the court has already stated, MGH has a substantial interest in furthering research and supporting inventions which have the potential to benefit both the hospital and its patients. This interest far outweighs any possible intrusion into Dr. Grocela’s privacy which, in any event, is de minimus.
ORDER
For the foregoing reasons, Defendants’ Motion to Dismiss the Second Amended Complaint or in the Alternative for Summary Judgment (Paper #40) is ALLOWED.

 Because the parties have submitted materials outside the *181 pleadings and have fully briefed the issues, the court will treat the motion as one for summary judgment pursuant to Mass.R.Civ.P. 56. See Mass.R.Civ.P. 12(b).

 Any net income generated is allocated among MGH and the inventor, or possibly others.

 While Dr. Grocela asserts that he is not an employee of MGH, “a formal notice of appointment is the equivalent of an employment contract.” Board of Regents of State Colls. v. Roth, 408 U.S. 564, 566 n.1 (1972).

 Indeed, HIPAA does not create a private right of action. See, e.g., Acara v. Banks, 470 F.3d 569, 571 (5th Cir. 2006) (“Because HIPAA specifically delegates enforcement [to the Secretary of Health and Human Services], there is a strong indication that Congress intended to preclude private enforcement”).